ADELAIDE C. MAXFIELD v. CHANNING SEABURY.

December 21, 1898.

Nos. 11,411—(163).

**Construction of Contract—Trust.**

> A contract between plaintiff and defendant, under which the former furnished money to the latter, to be, and which was, used in a certain mercantile business, construed. *Held*, that under its provisions defendant occupied a quasi trust relation as to plaintiff and in the care and use of said money.

**Same—Annual Balance Sheet—Embezzlement by Cashier—Proportionate Share of Loss.**

> The contract provided that at the end of each calendar year an account of the firm liabilities and property was to be taken, and a balance sheet made out and submitted to plaintiff, and, unless she should object within 10 days, such sheet was to "be conclusively deemed to be correct to all intents and purposes." Such sheets were submitted at the end of each

year from 1891 to 1894, inclusive, and no objections were made. In 1895 it was discovered that during each of these years the cashier of the concern had appropriated money to his own use belonging to his employers, but the amount taken in any one year could not be ascertained. *Held*, that the clause above quoted from the contract could not be construed so as to prevent defendant from charging up to plaintiff's account in 1895 her pro rata share of the total amount of money taken.

### Same—Successive Firms—Plaintiff not Chargeable with Proportion of Thefts from Former Firm.

Prior to the making of the contract, plaintiff's husband, his nephew, and defendant were co-partners in the mercantile business, and had in their employ the same cashier. His bad conduct commenced in 1888, while in their employ. Defendant bought out, for a lump sum, the interest of plaintiff's husband in the firm and its business, and he withdrew from the firm. *Held*, that under these circumstances defendant could not charge plaintiff with any part of the money stolen from the old firm, when submitting his balance sheet for the business of 1895.

Action in the district court for Ramsey county to recover $1,070.54, under the terms of the agreement mentioned in the opinion. The cause was tried before O. B. Lewis, J., without a jury, who ordered judgment in favor of defendant. From an order denying a motion for a new trial, plaintiff appealed. Reversed.

*John F. Fitzpatrick*, for appellant.

*Warner, Richardson & Lawrence*, for respondent.

COLLINS, J.

There is very little dispute over the facts in this case, and all need not be stated in this opinion.

1. It was found by the court that, according to the books of account kept by the old firm of Maxfield & Seabury, the interest of Louis H. Maxfield in the firm and in its business was of the value of $47,478.41, and that this was the amount which Seabury then and there agreed to pay Maxfield for his interest, the latter to withdraw from the firm. The agreement was consummated. Maxfield was paid $5,000 in cash December 5, 1890, and the balance of the amount agreed upon was evidenced by Seabury's notes, in different sums, all payable to Maxfield's order within one year, without interest. The transaction then stood completed as between Maxfield and defendant.

The new firm, composed of Seabury and W. T. Maxfield, under the firm name of Seabury & Co., was formed at once, and was continued during the years hereinafter mentioned. Seabury's notes were then indorsed and transferred by Maxfield to his wife, the plaintiff, but this was wholly without consideration. She was not an innocent purchaser for value.

2. The contract, made a part of the complaint, between the plaintiff and the defendant, was dated February 21, 1891, but was to take effect as of January 1, 1891, for two years. At the end of 1892 it was renewed for two years, and at the end of the year 1894 it was again renewed for one year. It recited that Seabury had received $40,000 of the plaintiff's money, by him to be invested in his own name in the firm business, and to be handled and finally accounted for as specified in said contract. It was provided in the second section that:

"At the end of each calendar year during continuance of this contract an account is to be taken of all the liabilities of said firm, and of all its property at the then current cash value thereof; and at the same time the net profit or net loss, if any, which shall have accrued from the business done by said firm during the next preceding twelve months shall be computed, estimated and agreed upon; and thereupon a balance sheet shall be made out and delivered to said Adelaide C. Maxfield, and, unless the same be objected to by her within ten days thereafter, the same shall thereupon be conclusively deemed to be correct to all intents and purposes."

The next section provided that, in case of an actual net loss in the business during the year for which a balance sheet had been rendered, one-tenth of such net loss should operate as a payment by Seabury, to that extent, upon the $40,000, the residue only to be accounted for to plaintiff. If a net profit had accrued, it was to be divided pro rata according to the amount of capital invested, up to 8 per cent. thereon. If the profit exceeded this per cent. plaintiff was to receive a further sum equal to one-tenth of the excess. The fourth, sixth and eighth sections were as follows:

"(4) At the end of the year 1892, unless this agreement shall then be renewed for some further period, said Seabury shall account for and pay over to said Adelaide C. Maxfield all that portion of said sum of forty thousand dollars ($40,000) received by him from her,

as above stated, which portion then remains invested in said business; and the amount then coming to said Adelaide C. Maxfield hereunder shall be by said Seabury paid to her in monthly instalments of five thousand dollars ($5,000) per month, until the same is fully paid."

"(6) Said Adelaide C. Maxfield is not to be a partner in said firm or business, nor is she to have any of the rights, powers or privileges of a partner therein; and during continuance of this contract said Seabury shall be under no personal obligation with respect to the sum of forty thousand dollars ($40,000) as herein mentioned, further or otherwise than as herein mentioned, but he shall and will keep said moneys invested as aforesaid, and handle such moneys with the same care and attention as he does with respect to his own capital invested in said business."

"(8) This agreement is made to take effect and be in force as of, from and after January 1, 1891, and the said sum of forty thousand dollars ($40,000) first herein mentioned is to be deemed invested in said business as of, from and after that date."

3. At the end of each year up to and including 1894, defendant made out and furnished the balance sheets mentioned in section 2, and no objection was made to either by plaintiff, although the yearly net profit seems to have been much less than 8 per cent.

In 1895 it was discovered by the firm that their cashier, Smith, had been stealing from his employers from the year 1888, his peculations, when discovered, amounting in the aggregate to over $11,000, of which amount he returned $7,000. When making the final balance sheet to plaintiff for the year ending December 31, 1895, defendant sought to·surcharge her account with $1,070.54 as her share of the amount stolen, to which she objected, and this lawsuit resulted, in which plaintiff is attempting to recover said sum, defendant having accounted for the remainder of her investment.

4. Smith's appropriation of money commenced more than one year prior to the dissolution of the old firm, in 1890, and continued down to the day it was detected, in 1895. The amount taken in any particular year could not be ascertained from the evidence, according to the findings, and as a conclusion of law the court below held that this was not material, for the purposes of this action, so long as the aggregate amount taken from both firms was determined. The effect of this conclusion was that, as against plaintiff's

claim under the contract, there could be offset that part of the amount taken from the old firm by Smith.

5. It appears that the sale made by Maxfield to Seabury in December, 1890, and the withdrawal of the former from the firm of Maxfield & Seabury, was brought about by a course of outside speculation indulged in by L. H. Maxfield, which was regarded as inimical to the business, and consequently to the interests of Mr. Seabury and Mr. W. T. Maxfield, his partners; and that Seabury offered, and Maxfield accepted, as the consideration, the amount which, from the books of the concern, appeared to be the value of Maxfield's interest in the firm and its business, January 1, 1890, all parties believing that the books had been honestly and fairly kept, and that Mr. Maxfield's actual interest was properly shown therein. It was, in fact, a lump sale, no effort being made to ascertain his real interest. It was made in good faith upon the part of all concerned, and, notwithstanding the thefts which had theretofore been committed by Smith, Maxfield's interest might have been of much greater value than the amount paid, or it might have been of much less value. There was no attempt to mislead, no false representation, and no warranty as to the real value of Maxfield's interest. Both parties acted upon their belief as to the firm books in ignorance of Smith's thefts, wholly excluding any consideration of profits or losses of the 1890 business.

It is probable that upon a sufficient showing the defendant might have a right to rescind the transaction of December 5, 1890, upon the ground of mutual mistake of fact, the unavoidable and natural result of the ignorance of both parties of Smith's bad conduct; but he cannot be allowed to retain the benefits of his bargain, if there were any, and at the same time demand restitution for losses which occurred before he purchased, but which were unknown at the time. This would result in injustice to the party of whom the demand was made, for it would enable defendant to avoid a contract as to those parts which would work him an injury, and affirm it as to those which would be profitable to him.

A mistake, in order to afford ground for rescission of a contract of sale, must have been mutual as to a material fact connected

with the subject-matter of the contract, and both parties must be placed in statu quo. Rescission must be entire or not at all.

So, on this branch of the case, it must be held that as to all or any of Smith's appropriations prior to the sale by L. H. Maxfield and his withdrawal from the old firm, the defendant had no right to assert a claim against the plaintiff.

6. This conclusion leads to a reversal of the order appealed from, but, as a new trial must be had, further consideration of the case seems necessary.

Plaintiff's counsel characterizes the furnishing of the money to defendant as a loan to the latter; but it was not a loan. Taking the contract as a whole, it is apparent that, as between the parties, Mr. Seabury occupied a quasi trust relation in respect to the $40,-000. He was to use it in the firm business as part of his own capital, was to handle it with the same care and attention as he used in handling his own money invested in the concern, was to account annually for a fixed share of the net profits, if any, and, if the business was conducted at an actual loss, the plaintiff was to suffer to the extent of one-tenth part thereof, no matter how great the loss might prove to be. This required of Seabury due care of the firm affairs and of the business in which the plaintiff's money was invested. He could not be negligent, and escape liability. And the court found as a fact that in the transaction of such business the defendant had exercised ordinary care. The correctness of this finding is not questioned.

So, with reference to a new trial, we are brought to a consideration of the claim of plaintiff's counsel that, each of the balance sheets submitted by defendant at the end of each year, not having been objected to by plaintiff, was final and conclusive upon both parties under the contract, the language of which—the latter part of section numbered 2—will be remembered. If these sheets were final and conclusive, the defendant could not charge plaintiff with any part of the moneys taken prior to January 1, 1895.

We have no doubt that the parties might have made a contract which would have covered a loss of the nature of that herein involved, but the question is whether they have made such a contract. The language employed is that a balance sheet made out

by defendant and submitted to plaintiff shall, if not objected to by her within 10 days, "be conclusively deemed to be correct to all intents and purposes." This is not as clear an expression of the parties' intent as it might have been, and the language must be construed with reference to the circumstances for the purpose of ascertaining whether it was designed that the balance sheet should be absolutely final and conclusive when held by plaintiff, without objection, for 10 days.

A balance sheet is nothing more or less than a summation and balance of accounts. It states and shows in a concise manner what is stated and shown by the books of account. It briefly exhibits their contents. It does not purport to be a true statement of the actual condition of affairs in a mercantile house, but a summary of what the books disclose the condition to be. Certainly, it was never intended by the parties that the balance sheets provided for should exhibit the real condition of the business, for that would be impossible while the house was giving credit. It was intended and expected that as to ordinary commercial transactions, such as may usually be anticipated in the business, the balance sheets should be full and accurate, and that they disclose affairs according to the usual course of business, and that all losses known to have occurred when any particular sheet was submitted to plaintiff should then be taken into consideration, made known and accounted for. As to these matters, these sheets were to be conclusive, deemed as correct unless objection was made, and in all probability final and conclusive as between plaintiff and defendant.

But the loss for which defendant sought to protect himself in this instance, to the extent of what he alleged was plaintiff's share, was not of the character to be anticipated in the usual course of business, nor was it a loss which could appear upon the books or in a balance sheet, until discovered. It could not have been contemplated when the contract was drawn, nor should we expect anybody to guard against it. Surely, the somewhat indefinite phrase heretofore quoted from the contract—merely a provision that for all intents and purposes the balance sheets should be deemed to be correct—would have to be very liberally construed in order to hold that with such an unusual and unexpected loss as this

was, and under all circumstances, each balance sheet was final and conclusive upon both parties, and that the real facts could in no manner be questioned after the expiration of the 10-day period.

We are of the opinion that when making and submitting the balance sheet for 1895 the defendant could properly surcharge plaintiff's account with her pro rata portion of the amount stolen by Smith subsequent to the date of the contract. ·

Order reversed, and a new trial granted.

CANTY, J.

I concur.   Under the agreement between plaintiff and defendant, the annual account was, after the 10 days, conclusive as to all matters except something so extraordinary and unusual that it must be said the parties never anticipated anything of the kind, and never had it in their minds, when making the contract, to make the account conclusive as to such a matter.